IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| RONALD D. WASHINGTON,<br>        *Plaintiff,*<br><br>v.<br><br>KROGER LIMITED PARTNERSHIP I,<br>        *Defendant.* | No. 3:11–cr–00074<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

  The Defendant Kroger Limited Partnership I ("Defendant"), pursuant to Fed. R. Civ. P. 56, seeks summary judgment on all claims asserted by Ronald D. Washington ("Plaintiff") in his complaint. Plaintiff filed his initial complaint with this Court on November 30, 2011, and filed an amended complaint on January 18, 2012.[1] Defendant's motion was heard on November 19, 2012. For the following reasons, I grant Defendant's motion for summary judgment.

I.    FACTUAL BACKGROUND

  Plaintiff began working for the Defendant Kroger Limited Partnership I in October of 1980. Plaintiff, who is African-American, worked his way up from bagger to cashier, grocery clerk to deli clerk, and eventually became a deli manager in 1999. From 1999 to 2010, Plaintiff worked as the deli manager at Kroger Store #403 in Waynesboro, VA. In total, Plaintiff's employment with Defendant spanned more than twenty-nine years.

---

[1] Plaintiff was represented by counsel until June 18, 2012, when Judge Crigler granted counsel's motion to withdraw as counsel of record.

1

In the spring of 2010, Tom Shepherd, the manager of Store #403, contacted Diana Gallion, Defendant's loss prevention specialist, regarding a series of cash shortages in the Store's deli department. Defendant installed a camera in the deli department, and Ms. Gallion reviewed a series of "MAX Reports," which are generated from the company's inventory database and track items purchased from each register in the store. Ms. Gallion eventually observed video footage of female employee #1 stealing from the deli department's cash register, and on May 5, 2010, Ms. Gallion and Mr. Shepherd brought that employee in for an interview. At the conclusion of the interview, employee #1 signed a statement and resigned her employment, effective immediately. Employee #1's interview and signed statement prompted Ms. Gallion to conduct a comprehensive investigation, which included the examination of more video footage, further review of MAX Reports, and interviews with three other employees working in the Store #403 deli department, including the Plaintiff.

Based on that investigation, Defendant concluded that Plaintiff had given and received unauthorized price reductions on merchandise from the deli department that he managed. Following its May 7, 2010 interview with Plaintiff, Defendant suspended him pending further investigation. Defendant terminated Plaintiff on August 9, 2010, when it changed his suspension to discharge, effective May 7, 2010, for his alleged violations of Kroger's Rules & Regulations (hereinafter "Basic Store Rules"). The parties did not agree on a settlement during the subsequent months, and Plaintiff's grievance action was eventually dropped by the United Food and Commercial Workers Union, Local 400 (the "Union") without proceeding to arbitration.

In both his initial and January 18, 2012 amended complaint, Plaintiff makes two principle allegations, encompassed within a single count titled "claim for race discrimination and retaliation." First, Plaintiff states that Defendant discriminated against him "with respect to the

2

terms, conditions, or privileges of employment because of his race[.]"  Second, Plaintiff alleges that Defendant "permitted a work environment to exist . . . that was offensive and hostile to plaintiff on account of his race."²

In support of his claims, Plaintiff states that "Kroger maintained at the grocery store in Waynesboro, Virginia a racially hostile and offensive work environment and harassed and treated [me] differently than [my] coworkers because of [my] race."  In his complaint, Plaintiff alleges that Mr. Shepherd, the Waynesboro store manager, stated, "We finally got rid of that nigger," or words to that effect, after Plaintiff was temporarily suspended for a previous matter.³  In his complaint, Plaintiff also references two white deli managers from different Kroger stores who, "on information and belief," took part in activities "similar" to those of which he was accused but were not discharged.  Plaintiff seeks damages for loss of income and employment benefits, including both front and back pay, compensatory damages, and punitive damages.

Defendant now moves for summary judgment, stating that Plaintiff's race played no part in its decision to terminate his employment.  In its supporting memorandum, Defendant asserts that Plaintiff cannot present any evidence that Defendant discriminated against him because of his race.  Further, Defendant argues that Plaintiff is unable to produce sufficient evidence to establish a hostile work environment claim.  As a result, Defendant contends that it is entitled to summary judgment as a matter of law.

---

² Plaintiff does not make any specific allegations regarding his protected activities, or retaliation generally, in either his complaint or opposition to Defendant's motion.  Throughout his employment with Defendant, Plaintiff never filed a report alleging harassment or discrimination because of his race.

³ While Plaintiff's complaint alleges that this statement was made after he was fired, Plaintiff clarified during his deposition that Mr. Shepherd allegedly made these comments in June 2009.  *See* Pl.'s Dep. p. 112.  Plaintiff had been temporarily suspended in May 2009, following an inspection of the deli department that allegedly revealed outdated merchandise on display.  In that instance, the Union submitted a successful grievance on Plaintiff's behalf, and Plaintiff returned to work effective June 7, 2009.

## II.     LEGAL STANDARD

Summary judgment under Rule 56 should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.

In considering a motion for summary judgment, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the non-moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The party seeking summary judgment bears the burden of showing an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325. If the moving party sufficiently supports its motion for summary judgment, the burden shifts to the non-moving party to set forth specific facts illustrating genuine issues for trial. *Emmett v. Johnson,* 532 F.3d 291, 297 (4th Cir. 2008) (citation omitted). On those issues for which the non-moving party has the burden of proof, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified in the rule. Fed. R. Civ. P. 56(c); *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1315–16 (4th Cir. 1993). *See also Cheatle v. U.S.*, 589 F. Supp. 2d 694, 698 (W.D. Va. 2008) ("Indeed, the non-moving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation.") (citation omitted).

The court's role is to determine whether there is a genuine issue based upon the facts, and "not . . . weigh the evidence and determine the truth of the matter." *Anderson,* 477 U.S. at 249. Ultimately, the trial court has an "affirmative obligation" to "prevent 'factually unsupported claims [or] defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24).

### III. DISCUSSION

#### A. Plaintiff's Race Discrimination Claim

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of race. *See* 42 U.S.C. § 2000e–2(a)(1). An employee may defeat a motion for summary judgment and establish a successful Title VII claim through either: (1) the mixed-motive framework, under which "it is sufficient for the employee to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons"; or (2) the *McDonnell Douglas* pretext framework, "under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284–85 (4th Cir. 2004); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05 (1973). "Regardless of the type of evidence offered by a plaintiff as support for [his or her] claim (direct, circumstantial, or evidence of pretext) . . . '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill*, 354 F.3d at 286 (quoting *Reeves,* 530 U.S. at 153).

5

### 1. Plaintiff's discrimination claim under a mixed-motive framework

Under a mixed-motive framework, Plaintiff may present direct or circumstantial evidence to show that racial discrimination was a motivating factor in the employer's adverse employment decision. *Hill*, 354 F.3d at 284. Direct evidence is defined as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotations omitted). Plaintiff has not presented any evidence of discriminatory intent regarding his firing that falls into this category.

Nor has Plaintiff presented sufficient circumstantial evidence that race was a motivating factor in his firing. In his complaint and August 29, 2012 deposition, Plaintiff states that the Waynesboro store manager used the word "nigger" during the course of his employment. Specifically, Plaintiff alleges that he was told by a co-worker that the store manager stated, "We finally got rid of that nigger," or words to that effect, after Plaintiff had been temporarily suspended in May 2009. Plaintiff also stated in his deposition and opposition that he learned from a second-hand source that Kroger's loss prevention specialist, who conducted the investigation that led to his 2010 suspension and firing, used the term "nigger" eight years ago, in reference to two other African-American employees.[4] Plaintiff admits that he never heard the term used once personally throughout the course of his employment, and he has not submitted any declarations from those who may have heard the term being used first-hand. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (The non-moving party's

---

[4] Though this point isn't addressed by Defendant, it appears that the alleged remark was made in the Charlottesville, VA Kroger store, rather than in the Waynesboro store where Plaintiff worked. *See* Pl.'s Dep. p. 112 ("[The loss prevention specialist] . . . has people in Charlottesville that she has affected . . . and she made a statement that a Kroger customer years ago heard along with one of the Kroger employees at the time, and she was trying to get rid of two black girls in the front office and walked down the aisle talking to the store manager and used the word nigger . . . .").

evidence cannot be hearsay and must "contain admissible evidence and be based on personal knowledge."). To be clear, Plaintiff has not submitted any form of admissible evidence regarding those two alleged incidents.

In his opposition, Plaintiff also cites discriminatory treatment based upon Defendant's "failure to follow standard disciplinary [procedures]" during the investigation stages of his case. During the November 19, 2012 motion hearing, Plaintiff explained that his May 7, 2010 interview with Defendant was unannounced, and that he was not provided with the particular union representative that he had requested.[5] However, Plaintiff has not provided any evidence to show that Defendant's particular investigation procedures were the product of racial discrimination. Ultimately, a plaintiff's subjective belief that he was discriminated against (and nothing more) is not sufficient to create a genuine issue of material fact as to the occurrence of any discriminatory conduct. *See Lovett v. Peaks*, 2009 WL 145003, at *6 (E.D. Va. Jan. 16, 2009); *Bryant v. Bell Atl. Md., Inc.,* 288 F.3d 124, 134-35 (4th Cir. 2002).

Defendant states that Plaintiff was fired based on the conclusions of its internal investigation, rather than any discriminatory intent. This Court withholds commentary regarding the conclusions Defendant drew from its investigation of the Store #403 deli department, as well as the basis Defendant has presented—including sworn employee statements and MAX Reports submitted as evidence with the Court—for its employment decision. *See Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir. 1997) ("It is axiomatic that an employer is free to set its own performance standards, provided such standards are not a 'mask' for discrimination.") (internal citations omitted); *see also Jiminez v. Mary Washington College,* 57 F.3d 369, 383 (4th Cir. 1995) ("The crucial issue in a Title VII action is an unlawfully discriminatory motive for a

---

[5] During his deposition, Plaintiff stated that Gary Massie, a "union steward," was present during his May 7, 2010 interview. *See* Pl.'s Dep. p. 60. However, Plaintiff revealed during the November 19, 2012 summary judgment hearing that he had instead asked for Teresa Branson, a union representative, to sit with him during questioning.

defendant's conduct, not the wisdom or folly of its business judgment."). It is Plaintiff's prima facie burden to present direct or circumstantial evidence under the mixed motive framework. *See, e.g., Freeman v. North State Bank*, 282 Fed. App'x 211, 215 (4th Cir. 2008). Plaintiff has not presented any direct or sufficient circumstantial evidence to show that racial discrimination was a motivating factor in Defendant's employment decision, and so we now proceed with our inquiry under the *McDonnell Douglas* framework.

### 2. Plaintiff's discrimination claim under the pretext framework

In order to establish a prima facie case under the *McDonnell Douglas* burden-shifting scheme, Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. *Bryant,* 288 F.3d at 133. If Plaintiff makes this showing, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. If the employer can do so, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's stated reasons are a pretext for unlawful discrimination. *Id.*

Plaintiff has not established a prima facie case under this framework. For starters, Plaintiff is unable to show that other employees who are not members of his protected class were retained or treated more favorably under similar circumstances. Along with Plaintiff, Defendant determined that two white female employees (#1 and #2) in the Store #403 deli department provided and received improper discounts on prime merchandise through a "$0.99 black bowl

special" pricing scheme.[6] Both employee #1 and employee #2 signed hand-written statements implicating Plaintiff in the scheme (discussed *infra*). Employee #1, who also admitted to stealing directly from the cash register, resigned her employment before Defendant issued any disciplinary action. However, Plaintiff received the same disciplinary action that employee #2 received from Defendant: suspension pending further investigation, and eventual discharge. While Plaintiff has continued to deny involvement in any pricing scheme, he acknowledged during his deposition that he and employee #2 received the exact same disciplinary action.

Plaintiff also states in his complaint that "on information and belief, two white deli managers at other stores did similar things [that he was accused of] but were not discharged." Plaintiff admitted in his deposition that he does not have any first-hand knowledge or evidence regarding these managers' activities. In its memorandum, Defendant reveals that the deli manager of Store #310 and the deli manager at Store #343, both admitted on June 17, 2010, to allowing deli employees to buy and sell out-of-date meat and cheese at a discounted price. However, Defendant has distinguished their cases from Plaintiff's in three respects: First, neither deli manager purchased any of the products they had marked-down for their own benefit (which Defendant has accused Plaintiff of doing); second, neither deli manager allowed employees to purchase prime merchandise at marked-down prices (only outdated and distressed merchandise); and third, neither deli manager shopped while on-the-clock or worked while off-the clock (which Defendant has also accused Plaintiff of doing). In his deposition, Plaintiff acknowledged that the allegations against the white deli managers of Store #310 and Store #343 were at least "a little" different than those against him. In any case, although the Union eventually intervened successfully on their behalf, the aforementioned white deli managers received the same

---

[6] Defendant describes the scheme as one in which select individuals would load up a black plastic tray with any items from the deli department's steam table and pay only $0.99. According to Defendant, this is a violation of the Basic Store Rules, which mandate that all food items must be properly weighed and priced.

9

disciplinary measure that Plaintiff received from the Defendant: indefinite suspension pending further investigation.[7]

Defendant has also presented evidence showing why, in its determination, Plaintiff's job performance was not satisfactory. These conclusions mirror Defendant's stated reasons for Plaintiff's suspension and discharge. Again, it is not the role of this Court to consider the wisdom of Defendant's employment decision; rather, it is only to determine whether Plaintiff can make out a prima facie case of discrimination. Regarding Plaintiff's job performance, Defendant states that he violated a number of its Basic Store Rules, including Rule 14 ("theft/improper charges"), Rule 8 ("shopping on the clock"), Rule 9 ("no marking own purchases"), Rule 11 ("no weighing or pricing own purchases"), and Rule 12 ("paying proper price"). Defendant based its findings on the sworn statements of three of Plaintiff's co-workers, the Store's internal MAX Reports, and video evidence.

Plaintiff has challenged the clarity of the video footage that Defendant alleges shows him shopping while on-the-clock and working while off-the-clock. Plaintiff also contests Defendant's allegation that he price-marked his own purchases, which is similarly a violation of Basic Store Rules. This Court has not seen any of the video evidence that Defendant cites. However, Defendant has submitted to the Court three sworn, hand-written statements by co-workers from the Store #403 deli department, which it cites as a key basis for its employment decision: (1) employee #1's statement accusing Plaintiff (among others) of "giving other employees and favored customers undue discounts on new and reduced products"; (2) employee #2's admission that she charged "employees and customers $0.99 for small black oval trays" and that "[Plaintiff] has made trays and I have charged for the meats and cheeses on those trays"; and (3) employee #3's statement that she was told by Plaintiff (among others) "to charge 99 cents for

---

[7] Conversely, the Union dropped Plaintiff's grievance in May 2011, and it was not brought to arbitration.

employees for lunch in black bowles [sic]" when she first started working in the deli department. Plaintiff has not presented any specific evidence to rebut these allegations.[8]

Even if Plaintiff could establish a prima facie case under the *McDonnell Douglas* framework, he has not presented evidence to show that Defendant's aforementioned reasons for his discharge are a pretext for unlawful discrimination. To show that these reasons were merely a pretext, Plaintiff would need to present evidence showing that Defendant's proffered explanation is "unworthy of credence." *Reeves,* 530 U.S. at 143 (citation omitted). Plaintiff states that his involvement in store theft is "practically nonexistent," much of what has been presented is "hearsay or otherwise objectionable or is not supported by the record," and alleges that "Kroger has used the vulnerable position of [employee #2] (and to a lesser degree [employee #1]), to establish a false evidentiary basis for terminating [his] employment." However, Plaintiff has not elaborated on these claims, or submitted any affidavits or other evidence to support his contentions.

While Plaintiff in his opposition and oral arguments has attempted to minimize Defendant's evidence and speculated about the "sham" basis for his firing, he has not presented sufficient evidence to show that his termination was merely a pretext for unlawful discrimination. Again, "mere speculation by the non-movant cannot create a genuine issue of material fact." *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001). Plaintiff is unable to establish a prima facie case of racial discrimination against Defendant. Even if he could, Plaintiff is unable rebut Defendant's evidence showing that his firing was based on non-discriminatory reasons, and thus Plaintiff's discrimination claim cannot stand.

---

[8] As further support for its conclusion that Plaintiff provided and received unauthorized discounts, Defendant notes that the deli department's MAX Reports from May 2009 to May 2010 show 65 purchases of $0.99 by Plaintiff for the steam-table item SKU-1111039150 (and 138 total in his department), and 6 purchases of $0.25 by Plaintiff for item SKU-24978100000 (and 81 total in his department). Plaintiff insists that all of his purchases from the deli department reflect a properly price-marked item.

11

### B. Plaintiff's Hostile Work Environment Claim

A Title VII claim for a racially hostile work environment requires a plaintiff to show that the discrimination or harassment was (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the terms of employment and create an abusive atmosphere; and (4) that it was imputable on some factual basis to his or her employer. *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183–84 (4th Cir. 2001). Plaintiff's claim falters in two respects: First, his complaint and subsequent arguments describe conduct that is insufficiently pervasive to alter the terms of his employment and create an abusive atmosphere in the context of the case discussions in this circuit; and second, Plaintiff has presented no admissible evidence to support his contention, such that, at this point, a reasonable jury could not rationally find in his favor.[9]

To meet Title VII's "severe and pervasive" prong, a plaintiff's workplace must be "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal citations and quotations omitted). "Relevant considerations 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Spriggs,* 242 F.3d at 184 (quoting *Harris,* 510 U.S. at 23).

There is no bright line test for the "number of times a supervisor or employer can use a racial slur while addressing an employee without creating a hostile work environment for Title VII purposes." *Hampton v. J.W. Squire Co.,* 2010 WL 3927740, at *3 (W.D. Va. Oct. 5, 2010). Thus, courts attempt to distinguish allegations of pervasive use with isolated instances that do

---

[9] "The question at the summary judgment stage is not whether a jury is sure to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find." *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 334 (4th Cir. 2011).

not rise to the level of severity necessary alter the conditions of an employee's work environment. *Roberts v. Fairfax County Public Schools*, 858 F. Supp. 2d 605, 610 (4th Cir. 2012). For example, in *Spriggs,* the Fourth Circuit found "incessant" racial slurs from a supervisor who "rarely hesitated to vilify anyone of African descent" to be sufficiently severe and pervasive for a hostile work environment claim. *Spriggs*, 242 F.3d at 182. Similarly, in *White v. BFI Waste Servs., LLC*, 375 F.3d 288 (4th Cir. 2004), the court found conduct sufficiently severe and pervasive where, "throughout [plaintiff's] employment," supervisors "repeatedly called him and other black employees [racial slurs]." *White*, 375 F.3d at 297. Conversely, in *Skipper v. Giant Food Inc.,* 68 F. App'x 393, 398 (4th Cir. 2003), the court found that a workplace where a manager harassed plaintiff by following him around and referred to him using a racial slur on one occasion, coupled with plaintiff's daily exposure to racist graffiti and overhearing other employees use the same slur thirteen times in a four-year period, to be insufficient under Title VII's "severe and pervasive" prong. Similarly, in *Hampton,* the Western District found that a supervisor referring to the plaintiff using the term "nigger" on three occasions to be insufficient. *Hampton*, 2010 WL 3927740, at *3. *See also Roberts*, 858 F. Supp. 2d at 612 (finding that two isolated uses of a racial epithet alleged by a teaching assistant were insufficient to meet the "severe and pervasive" prong of a hostile work environment claim under Title VII).

Plaintiff cites two instances where superiors allegedly used the term "nigger": (1) by the Waynesboro store manager, upon Plaintiff's prior suspension in early June 2009; and (2) by the Defendant's loss prevention specialist, in reference to other Kroger employees approximately eight years ago. Plaintiff did not hear either utterance first-hand, and it appears that the loss prevention specialist's alleged statement was made in a different Kroger store altogether. *See*

*supra* note 3.  While Plaintiff later stated that he was told by his former colleague (employee #1) that she heard the Waynesboro store manager use the term "nigger" on other occasions, he fails to provide any specifics or supporting declarations.  Given the precedent discussed above, Plaintiff's specific allegation that he learned from a first and second-hand source that two superiors used a racial slur on two occasions is insufficient to demonstrate the pervasiveness or severity required to establish a hostile work environment claim.

Further, as mentioned, Plaintiff has not submitted any verified statements to support his specific allegations.  It is not the role of the court "to weigh the evidence, to count how many affidavits favor the plaintiff and how many oppose him, or to disregard stories that are hard to believe."  *Gray v. Spillman,* 925 F.2d 90, 95 (4th Cir. 1991).  Nonetheless, it remains the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir. 1993).  Plaintiff admits that he never heard his store manager or the Defendant's loss prevention specialist use the term "nigger" personally.  As stated, "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."  *Maryland Highways Contractors Ass'n v. State of Md.,* 933 F.2d 1246, 1251 (4th Cir. 1991).  Notwithstanding considerations of the pervasiveness or severity of the incidents that he identifies, Plaintiff has not submitted any admissible evidence to support his allegations at this summary judgment stage.

### C.  Discovery Dispute

In his opposition, Plaintiff states that summary judgment is not appropriate at this time, because he "is in the process of collecting the information necessary to adequately present his case to a jury."  As a general proposition, "summary judgment is appropriate only after adequate time for discovery."  *Evans v. Tech. Applications & Serv. Co.,* 80 F.3d 954, 961 (4th Cir. 1996)

(internal quotation marks omitted). At minimum, a court "must refuse summary judgment where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition." *See Nader v. Blair,* 549 F.3d 953, 961 (4th Cir. 2008) (internal quotation marks omitted).

In fact, discovery is complete at this point, given the Court's October 23, 2012 cut-off deadline, which was more than eight months after the parties' Rule 26(f) conference.[10] Defendant timely answered Plaintiff's first set of discovery requests back in April 2012. Conversely, Plaintiff missed his March 23, 2012 deadline to answer Defendant's interrogatories and production requests, prompting Defendant to file a motion to compel responses on April 10, 2012. Plaintiff eventually submitted his responses on May 1, 2012. On July 9, 2012, Judge Crigler issued an order granting Plaintiff's request to modify the deposition schedule but denying his request to stay proceedings, "to the extent that the discovery cutoff deadline, dispositive motions deadlines, and the trail date set forth in the Clerk's February 29, 2012 Notice are to remain in effect." In all, nearly three months passed between Judge Crigler's order and Plaintiff's second set of discovery requests, which he mailed on October 1, 2012, giving Defendant an October 30, 2012 deadline to respond—a full week after the court-ordered discovery deadline was set to expire.[11] Furthermore, Plaintiff waited until his October 24, 2012 opposition to Defendant's motion for summary judgment to state that he "has only begun

---

[10] Two days after the Rule 26(f) conference, held on February 21, 2012, Defendant served its first set of interrogatories and production requests on Plaintiff. Five days after that, Defendant served Plaintiff with its Rule 26(a)(1) initial disclosures. Plaintiff, on the other hand, waited until March 9th to serve his disclosures, which he supplemented on March 30th.

[11] Under Fed. R. Civ. P. 34(b)(2)(A), a party to whom a discovery request is directed shall have thirty days to respond to such request.

discovery" and express dissatisfaction with Defendant's lack of responses to his requests.[12] Since Plaintiff filed that opposition, Defendant has responded to his second set of discovery requests (nearly entirely through objections). At this point, there is no discovery dispute of merit that warrants a delay in deciding Defendant's motion for summary judgment.

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment shall be granted, and Plaintiff's case shall be struck from the Court's active docket. An appropriate order accompanies this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to Plaintiff and all counsel of record.

Entered this __4th__ day of December, 2012.



NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[12] While typically a party makes this type of argument via a Rule 56(f) affidavit, *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002), Plaintiff did not do so in this case. However, if the nonmoving party's filing "serve[s] as the functional equivalent of [a Rule 56(f)] affidavit, and if the nonmoving party was not lax in pursuing discovery, then [a reviewing court] may consider whether the district court granted summary judgment prematurely[.]" *Id.* (internal quotation marks and citations omitted).